ATTORNEY GENERAL, EX REL. EDWIN F. CONELY, v. THE COMMON COUNCIL OF THE CITY OF DETROIT.

*Elections—Registration—Constitutional law.*

1. Act No. 468, Local Acts of 1889, relative to the registration of voters, etc., in the city of Detroit, is unreasonable and void, in that it undertakes to disfranchise a large number of voters, through no fault of their own, and to make an unjust and unlawful discrimination between the rights of native-born and naturalized citizens and electors.

2. The following propositions are summarized from the opinion of Mr. Justice MORSE:

    *a*—The expense attendant upon obedience to a valid law cannot be alleged as a sufficient reason for not obeying it.

    *b*—The Constitution authorizes the Legislature to enact laws "to preserve the purity of elections, and to guard against abuses of the elective franchise;" but this does not authorize, by direction or indirection, the disfranchisement, without his

own fault or negligence, of any elector under the Constitution.

c—The laws to regulate elections, and to preserve their purity, and to guard against abuses to the elective franchise, must be reasonable, uniform, and impartial, and must be calculated to facilitate and secure, rather than to subvert and impede, the exercise of the right to vote. *Capen v. Foster*, 12 Pick. 488.

d—There is no good reason why the boards of registration cannot sit within the ten days before election necessary to gain a *voting* residence, and thereby preserve to each elector his constitutional right; and the constitutional term of such residence cannot be increased under the guise of regulation, any more than it can be done directly, as a mere exercise of the legislative will.

e—A registration law is unreasonable which contains no provision by which an elector who is sick on the days fixed for registration can vote on election day.

f—The object of a registry law, or of any law to preserve the purity of the ballot-box, and to guard against abuses to the elective franchise, is not to prevent any qualified elector from voting, or unnecessarily to hinder or impair his privilege.

g—In order to prevent fraud at the ballot-box, it is proper and legal that all needful rules and regulations be made to that end; but it is not necessary that such rules and regulations shall be so unreasonable and restrictive as to exclude a large number of legal voters from exercising their franchise. The power of the Legislature in such cases is limited to laws regulating the enjoyment of the right, by facilitating its lawful exercise, and by preventing its abuse. The right to vote must not be impaired by the regulation. It must be regulation, not destruction. *Page v. Allen*, 58 Penn. St. 338; *Dells v. Kennedy*, 49 Wis. 555; *Edmonds v. Banbury*, 28 Iowa, 267; *Monroe v. Collins*, 17 Ohio St. 665, 685; *Daggett v. Hudson*, 43 Id. 561; *State v. Butts*, 31 Kan. 554.

h—Requirements which compel a naturalized elector to produce his certificate, or show by evidence other than his own oath that such a certificate was issued, make an unfair and unnecessary distinction between native-born and naturalized electors.

i—No registry law is valid which deprives an elector of his constitutional right to vote by any regulation with which it is impossible for him to comply.

j—No elector can lose his right to vote, the highest exercise of the freeman's will, except by his own fault or negligence.

*Mandamus.* Submitted October 11, 1889. Denied October 11, 1889, and opinion filed December 28, 1889.

Relator applied for *mandamus* to compel the common council of the city of Detroit to observe and carry out the provisions of Act No. 468, Local Acts of 1889, relative to the registration of voters, etc., in the city of Detroit. The facts are stated in the opinion.

*S. V. R. Trowbridge,* Attorney General, and *Edwin F. Conely ( William P. Wells,* of counsel), for relator.

*John W. McGrath,* for respondent.

MORSE, J. At the last session of the Legislature an act was passed, entitled—

"An act to preserve the purity of elections, and guard against abuses of the elective franchise, in the city of Detroit."

This act was approved by the Governor July 1, 1889, upon which day it took effect, and became operative. Local Acts of 1889, p. 994.

The relator, in his petition, sets forth that the common council of the city of Detroit has neglected and failed to comply with the law, and still fails and neglects to do so, although well aware that the necessity of such compliance is reasonable and urgent; and that he believes that said common council intend to ignore the act entirely, and that such body intend to hold the city election to take place in November, 1889, under the registration and election laws in force before the passage of this act, the same in every respect as if no such act had been passed. The Attorney General therefore asks that this Court issue a peremptory *mandamus* to compel said common council to resubdivide into election precincts or districts, containing each not more than 300 electors resident therein, such wards of the city of Detroit as may require it, under this act, and to provide suitable and proper means for the registration of electors, upon such subdivision or re-.

arrangement, as the circumstances may require. The relator, from the records in the city clerk's office, makes a showing of the number of votes cast in each election district now existing in said city, 61 in number, at the November election in 1888. This showing, under the act, would necessitate the creation of 68 additional precincts, making a total of 129.

Section 1 of the act provides:

"That, as soon as possible after this act shall take effect, the common council of the city of Detroit shall by ordinance, if it shall appear that at the election held in November, 1888, or at the election held in April, 1889, more than 500 votes were cast in any election precinct, again divide the ward or wards in which such precinct or precincts may be, and establish new election precincts or districts therein, if necessary, or re-arrange the same so that each precinct shall contain, as near as may be, an equal number of electors, no precinct to contain more than 300 electors resident therein; and as often as it shall appear, after any election thereafter held, that more than 600 votes have been cast in any election precinct, said precinct shall, within six months after said election, again be subdivided, or the precincts of the entire ward be re-arranged and divided, so that each precinct shall contain 300 electors, as near as may be, resident therein."

Section 2 provides that for the registration, as provided by the act, to be held in 1889, the inspectors of election selected at the last election shall act, and hereafter four persons for each election precinct, respectively, residents and electors therein, shall be selected in the manner now by law provided for the selection of such inspectors in said city, to act as a board of registration for such precinct, and such board shall elect one of its number as chairman. Said section also constitutes these boards of registration election inspectors, and, in case of the unavoidable absence at any time of any member of the board, the remaining members may temporarily appoint another person to act in his stead until he appears.

The remaining 23 sections of the act relate to the manner and effect of the registration of voters, some of which sections will be noticed hereafter.

The common council of the city of Detroit, in answer to the order to show cause why the writ of *mandamus* should not issue to compel them to obey this law, says:

1. That a compliance with the law would create in all 129 voting districts; that the expense of such compliance for the approaching municipal election would be over $23,000, and probably $25,000; that the amount to be raised for this purpose upon the assessment and levy for taxes this year is but $6,000; the act was passed after such assessment and levy, and makes no provision for the expense attending and necessary to its execution; that there is no money in the contingent fund of the city, and such expense can lawfully be paid from no other fund.

2. That there are at least 35,000 voters in the city of Detroit, of whom there are at least 5,000 foreign-born electors, who have taken out their naturalization papers, or declared their intention to become citizens, without the State of Michigan; that large numbers of persons so naturalized in other states have voted, from year to year, from five to forty years, within the city of Detroit, and their citizenship has been open and notorious, and their qualifications as electors conceded; that many of them have not now their citizenship papers, but the same have been lost or destroyed; that in many instances it would be impossible to procure certified copies of the same, or any record evidence of their issue; but said electors are able to procure abundant evidence of their exercise of the rights of citizenship, and of electors; that under laws heretofore existing these men have been able to produce sufficient evidence of their rights as electors, but that the act under consideration here practically disfranchises these, at least 1,500, people, who are in fact and in law qualfied voters in said city.

3. That this law will also disfranchise a large number of electors, residents of Detroit, who do business outside of and away from said city, as such persons will necessarily be absent from the city during the days fixed by this act for registration.

4. That it will also disfranchise those persons who from

sickness are unable to appear before the boards of registration on such days.

5. That it will disfranchise those moving from one ward to another after the last day of registration, who are electors under the Constitution and general laws of the State as to qualifications of voters.

6. That there are at present five duly-elected election inspectors in each of the present 61 election precincts.

That for these reasons, and for other good and substantial reasons appearing upon the face of the law, the act is inoperative, burdensome, unreasonable, unconstitutional, and void.

Upon hearing and argument of this matter upon petition and answer, we, on October 11, 1889, denied the application for the writ. The reasons for so doing will now be stated.

The first objection, as to expense, we did not consider, as it could not be alleged as a sufficient reason for not obeying a valid law.

But a serious difficulty arises in the outset, as to the operation of this law. If we were concerned only with the question of dividing the wards of the city into election districts containing not more than 300 electors,—certainly a desirable thing,—there could be no hesitation in granting the writ; but the object of this law is not simply to create voting districts where the electors shall not exceed this number, but it is a scheme for a new system of registration, and requiring that all persons not complying with the rules and regulations of such registration shall not be permitted to vote, under any circumstances whatever, under heavy penalties. The machinery for the approaching municipal election is not provided by the law, except as it undertakes to provide the same from the law now in force, and which it undertakes to repeal. By this neglect to provide for this emergency, we think the act is inoperative. There are now 61 election districts, with 5 inspectors in each, making in all

305 inspectors. Under this act there must be 129 districts. Under section 1 of the act, by the statement of votes cast in November, 1888, found in relator's petition, there are but 3 wards—the Fourteenth, Fifteenth, and Sixteenth—that will be undisturbed. In the other 13 wards there are precincts in each that cast over 500 votes. These wards must be re-arranged and subdivided, and 120 districts created, in all, therein. There are 3 precincts each in the remaining wards. An inspector cannot act out of his own precinct; and consequently 45 of those now in office will remain in these 3 wards, as before. But, of the remaining 260 inspectors who are to act in the 120 districts to be created, none of them can act out of the wards or precincts in which they live. As far as their duties as inspectors of election are concerned, there would be no trouble, as the people at the opening of the polls would have an undoubted right to fill all vacancies by election on the spot, or to create an entire new board, if there were no inspectors left in such precinct by the new division and arrangement of the ward.

But it is different with such inspectors acting as a board of registration before election day. The authority to fill vacancies, or to create an entire new board of registration, must be found in the laws. There is no inherent right in the people to do it. This law makes no provision for filling any vacancies in the inspectors acting under the present law. There are but 260 inspectors for 120 districts,—a fraction over 2 for each. It must necessarily happen that in the new subdivision of these wards some precincts will have more than their proportion residing within their limits, and some less, and some will have none. If any precinct should, in such division, be left without any inspectors residing within it, the inevitable result, under this act, would be the disfran-

chisement of the electors of such precinct for want of registration. *People v. Kopplekom*, 16 Mich. 341. There is no provision in this act providing for any such event, and, having repealed all other registration laws in the city of Detroit, there are no existing statutes to aid or remedy the difficulty.

But, in my view, the law is unreasonable and void in that it undertakes to disfranchise a large number of voters, through no fault of their own, and to make an unjust and unlawful distinction between the rights of native-born and naturalized citizens and electors. The Constitution authorizes the Legislature to enact laws "to preserve the purity of elections, and guard against abuses of the elective franchise;" but this does not authorize, by direction or indirection, the disfranchisement, without his own fault or negligence, of any elector under the Constitution. Article 7, § 6.

The Constitution provides that—

"In all elections, every male citizen, every male inhabitant residing in the State on the 24th day of June, 1835, every male inhabitant residing in the State on the first day of January, 1850, who has declared his intention to become a citizen of the United States, pursuant to the laws thereof, six months preceding an election, or who has resided in the State two years and six months, and declared his intention as aforesaid, and every civilized male inhabitant of Indian descent, a native of the United States, and not a member of any tribe, shall be an elector, and entitled to vote; but no citizen or inhabitant shall be an elector, or entitled to vote at any election, unless he shall be above the age of twenty-one years, and has resided in this State three months, and in the township or ward in which he offers to vote ten days next preceding such election."

There is also a provision as to electors in the army or navy, not necessary to be here recited. Article 7, § 1.

By this section of the Constitution it will be noticed that there are five distinct classes of persons who are

made electors, and the only qualification to any of these classes is that the elector shall be of age, and have resided in the State three months, and in the township or ward where he offers to vote ten days, next preceding the election. It cannot be for a moment contended that by section 6 of article 7 the framers of the Constitution intended to give the Legislature the power to arbitrarily disfranchise any elector who is such under section 1 of the same article, or to make any difference between the rights of any of the classes of electors therein specified, or to put obstacles in the way to the ballot-box for one class, while the road is left open to another. The laws to regulate elections, and to preserve their purity, and to guard against abuses to the elective franchise, must be reasonable, uniform, and impartial, and must be calculated to facilitate and secure, rather than to subvert and impede, the exercise of the right to vote. *Capen v. Foster*, 12 Pick. 488.

Let us examine the act before use. See Local Laws of 1889, p. 994. The plan of registration under this law is extensive and minute in its details. In this discussion we shall only concern ourselves with its general features and results. It provides that in the year 1889, and again in 1892, and every fourth year thereafter,—striking, by design or accident, a presidential election year,—there shall be a new and complete general registration of voters in the city of Detroit. And it is made the duty of every elector to see that his name is registered in compliance with the requirements of the law, and he shall not be deemed to have acquired a legal residence in the precinct unless he has so caused himself to be registered, "nor shall any ballot be received by the inspectors at any election, *under any pretense whatever,* unless the name of the person offering such ballot shall have been

entered in the register of the precinct in which he claims to vote as herein provided." Sections 3 and 4.

The elector must personally apply to the board for registration, and such board "shall examine each applicant." Persons who will be of age on election days, having the other qualification of electors, may be entered on the register. "Every applicant, in the years when a general new registration is required, who has commenced to reside in such precinct, and who has resided therein at least two days," if he be otherwise qualified, shall be entered on the register, and can vote on election day, if he has resided therein ten full days next preceding. Section 7.

The meeting of these boards of registration for 1889, and for 1892, and every four years thereafter, is first to be held on the first Monday of October, at which time the board sits for four days, and also again one day, on the fourth Monday of October. The law makes no provision for any other registration in the years of this new or general registration. In this year, the fourth Monday of October came on the 28th, and the city election on the 5th of November, there being seven days between the last day of registration and election day, but whenever the month of October begins on Sunday, Monday, or Saturday more than 10 days will ensue between the last day of registration and the day of election, and, as the act requires that the elector must have actually resided in the precinct two days before his name can be entered on the registry book, this act, in the years of general registration, will disfranchise every voter who has not resided 16 or more days in the precinct before election day, whenever the month of October begins on either one of these three days. For instance, in 1888, October began on Monday. The fourth Monday was the 22d. The general election day was November 6, leaving 14 full days

between the last day of registration and election; and, adding the two days, every elector not residing within the precinct for 16 full days before the day of election, under this act, would have been deprived of his vote. This would be in direct conflict with the Constitution, which makes him an elector upon a residence of 10 days. No such regulation as this is reasonable. There is no good reason why the boards of registration cannot sit within the 10 days before election, and thereby preserve to each elector his constitutional right. Nor is this all. If the Legislature can make the residence 12 or 16 days, it can make it a month, three months, or one year. This, in my opinion, cannot be done indirectly, under the guise of regulation, any more than it can be done directly, as a mere exercise of the legislative will. And as one will contend that the Legislature could prescribe by statute that a resident of the city of Detroit must reside in a precinct 12 days, 16 days, or a month, before his ballot could be legally taken on election day, in the face of the Constitution, which provides that he need reside therein but 10 days.

But more unreasonable yet is this act in that it contains no provision by which a person who is sick or absent on the days of registration can vote on election day. It may be said, with some show of reason, perhaps, that a person who is absent on the registration days is himself in fault, in not returning to his home, and complying with the regulations which the Legislature have a right to prescribe; but the man who is ill, and unable to attend the meetings of the board, but who is able to be out on the day of election, is deprived of his ballot, and for no good reason, that I can see. And neither do I think there is any necessity of disfranchising a large number of business men, who will be disfranchised, unless they drop important business, and travel many miles to

be registered, some seven or more days before election. There are, under this law, but five days in the whole year that an elector can cause his name to be placed on the registry list; and this, unmistakably, by the provisions of the act, he must do personally. The language of the supreme court of Ohio, in speaking of a similar statute of that state, which was by that court unanimously declared unconstitutional, seems very appropriate here:

"It will be seen by the above there are but *seven* [five] days in the year when voters can register.  *  *  * There is no provision for registering at pleasure during the earlier part of the year, and no provision for proving qualifications on election day, and voting.  And  * * * it is declared that 'no vote shall be received at any election aforesaid unless the name of the person offering to vote be on the registry,' etc.  A voter who is the oldest inhabitant of the ward, and an elector in it for the greater part of his life-time, if from absence, however necessary or unintentional, during the seven days, cannot vote if his name is not on the registry.  Many absentees may get home to vote, and, if they were afforded opportunities during the year, might also register, whose right of suffrage must necessarily be lost under the act.  How many mechanics may be absent, pursuing their trades, during the seven days?  A large number of persons will be away on steam-boat and other sailing craft, and elsewhere, earning a support.  A large number of students; a great many of the class usually termed 'commercial travelers,' will be away, perhaps planning their trips to be home on election day.  A large number of citizens in government employ, at Washington and elsewhere, will be at their posts of duty, and may return to vote, but would hardly have the opportunity to return on a different day to register.  Even the members of this Court might be unable to register, without a decided detriment to the public business, and might be compelled to elect between the neglect of important official duties and the loss of suffrage."  *Daggett v. Hudson,* 43 Ohio St. 561 (3 N. E. Rep. 543).

There is no state in the Union that has ever sustained

a law like this, except Illinois. All of the registration laws that have been upheld by the courts of other states have contained some provision by which a sick or absent voter might not necessarily be disfranchised, excepting the law of 1885 in Illinois. See *People v. Hoffman*, 116 Ill. 587 (5 N. E. Rep. 596 and 8 Id. 788).

In Massachusetts the board must be in session one hour on the day of election. *Capen v. Foster*, 12 Pick. 485.

In Iowa an elector unregistered, but otherwise qualified, is permitted to vote upon showing a proper reason for not having registered in time, and furnishing the affidavit of a registered voter as to his proper residence. *Edmonds v. Banbury*, 28 Iowa 267.

The election law of Kansas provides that the registry shall close 10 days before election, but permits the voter to register at all times during the year, except on these last 10 days. *State v. Butts*, 31 Kan. 537 (2 Pac. Rep. 618). See, also, Rev. St. Me. 95; Revision N. J. p. 364, § 152; Sup. Code, Md. 240 et seq.; Code Ala. p. 230, § 233; Dig. Laws Ark, 1874, p. 471, § 2328.

In Mississippi registration is required, and the registration lists are to be kept by the clerk of the circuit court, and any person not on the lists may appear at any time before the clerk and be registered.

In Kentucky a clause in a registration law applying only to the city of Louisville, which provided that the elector must reside in the city one year preceding the election, was held void because the constitution required but 60 days' residence in a precinct, and one year in Jefferson county. The balance of the law was sustained, but registration was permitted by the act within the last 3 days preceding the election. *Com. v. McClelland*, 83 Ky. 686.

The registry act of Missouri requires the registration of

voters to be completed 10 days before the election, but this is also a constitutional requirement.

In California the elector may have his name entered on the list at any time before the poll of the election is opened; but, if he does not do this 30 days before election, he must show a good reason why he did not procure the enrollment of his name previous to said 30 days. *People v. Laine,* 33 Cal. 55; *Webster v. Byrnes,* 34 Id. 273.

In New York, as to cities, under the law of 1865, the board of registration met on Monday before election, which is the day before; and under the amendment of 1872 the registry is completed on the Saturday night before election. The question of its constitutionality has not been raised.

In *Byler v. Asher,* 47 Ill. 101, it was held that the registry law of Illinois was valid; but under that act the non-registered voter was allowed to vote on making proof, in the manner prescribed in the statute, of his right to vote, without showing any excuse for not registering. In *People v. Hoffman,* 116 Ill. 587, a law was sustained which provided for the close of registration on the third Tuesday before election; but, under the constitution of that state, a man must reside in the voting precinct 30 days before election. Nothing is said in the opinion as to persons absent or sick upon the days of registration, but the law makes no provision for an after registry by such electors.

In Wisconsin a registry law providing that no vote should be received at any general election unless the name of the person offering to vote be on the registry as completed by the board, except in the case of a person becoming a qualified voter of the election district after the last day for the completion of the registry, who might vote on making certain specified proof of that fact,

was held unconstitutional because it gave no opportunity for sick and absent persons to register and vote after the completion of the registry lists. *Dells v. Kennedy*, 49 Wis. 555 (6 N. W. Rep. 246, 381). Under this act, as shown by Taylor, J., in a dissenting opinion at page 569, 49 Wis., and page 385, 6 N. W. Rep., the sick or absent person, being advised of the days of registration, could send his application by writing. But in the act before us this cannot be done.

The registry law of Pennsylvania permits an unregistered voter to prove his qualifications and vote on election day. *In re McDonough*, 105 Penn. St. 490.

In Connecticut (see *Hyde v. Brush*, 34 Conn. 454), it appears from the opinion filed in that case that the registry lists must be closed on Wednesday of the week preceding the election, which would be from four to five days; but it is not stated what the opportunities are for registering before that time.

In our own State the provision as to sick and absent voters is well known; and so far no great abuse of the elective franchise has been developed from the exercise of the privilege therein granted, of registering on election day. How. Stat. § 93

The object of a registry law, or of any law to preserve the purity of the ballot-box, and to guard against abuses of the elective franchise, is not to prevent any qualified elector from voting, or unnecessarily to hinder or impair his privilege. It is for the purpose of preventing fraudulent voting. In order to prevent fraud at the ballot-box, it is proper and legal that all needful rules and regulations be made to that end; but it is not necessary that such rules and regulations shall be so unreasonable and restrictive as to exclude a large number of legal voters from exercising their franchise. Nor can the Legislature, in attempting, ostensibly, to prevent fraud, disfranchise

legal voters without their own fault or negligence. The power of the Legislature in such cases is limited to laws regulating the enjoyment of the right, by facilitating its lawful exercise, and by preventing its abuse. The right to vote must not be impaired by the regulation. It must be regulation, not destruction. *Page v. Allen,* 58 Penn. St. 338; *Dells v. Kennedy,* 49 Wis. 555; *Edmonds v. Banbury,* 28 Iowa, 267; *Monroe v. Collins,* 17 Ohio St. 665, 685; *Daggett v. Hudson,* 43 Id. 561; *State v. Baker,* 38 Wis. 71; *State v. Butts,* 31 Kan. 554.

These authorities all tend in one direction. They hold that the legislature has the right to reasonably regulate the right of suffrage, as to the manner and time and place of voting, and to provide all necessary and reasonable rules to establish and ascertain by proper proof the right to vote of any person offering his ballot, but has no power to restrain or abridge the right, or unnecessarily to impede its free exercise. This law before us disfranchises every person too ill to attend the board of registration, and unreasonably and unnecessarily requires persons whose business duties, public or private, are outside of Detroit, to return home to register as well as to vote, making two trips when only one ought to be required.

This act is also not impartial. It seems to be aimed especially at naturalized voters, and, taken all in all, was fitly characterized by one of the counsel as "an act to disfranchise a large number of the legal voters of the city of Detroit." In providing particularly and minutely for the forms of entry in the books of registration (see sections 5–8), subdivision *h* of section 8 provides that:

"*h.* In the column headed 'Court,' the designation of the court in which, if naturalized, such naturalization was had, or, if a declaration of intention was made, the name of the court from which the certificate was issued, and, if the applicant claims the right to be registered and vote as a naturalized citizen, or because he has declared

his intention six months or more prior to the election, he must produce the proper certificate of such naturalization, or declaration of intention, or satisfactory evidence, other than by the oath of the applicant, must be produced, that the same was issued·"

By another subdivision of the same section there must be set down in this book the "date of papers," the time of such naturalization or the making of the declaration, "as appears by the certificates, or other duly authenticated evidence thereof." Subdivision *g*.

The essence of these requirements is that the naturalized voter must produce his certificate, or show, by evidence other than his own oath, that such a certificate was issued. And it would seem that, if he cannot procure from the records of the court evidence that such a certificate was issued, or declaration of intention made, he must produce some person, besides himself, who was present when the declaration was made or certificate issued. Perhaps, under a liberal construction of the law, one who could swear that he had seen the certificate would be a sufficient witness; but, how is he to testify to the date, and the particular court that issued it, or that it was genuine? Why should a person claiming to be an elector by naturalization be debarred, if he has lost his certificate, from establishing such fact by his own oath? A person may swear that he is native born, and he is not required, also, to prove this fact by some one else, before he can be registered; but, if he wishes to show that he is an elector by naturalization, he is presumed to be unable himself to tell the truth under oath, and must be corroborated by some one. The easiest way for a person of this class, wishing to cast a fraudulent vote, would simply be to swear that he was born in the United States; and in such case a perjurer is put to less trouble to get on the registry list than an honest man who

desires to show that he has been naturalized, but who, unfortunately, has lost the record evidence of such naturalization. This distinction between native-born and naturalized electors is an unfair one, and, as above shown, entirely unnecessary in order to prevent fraud. Its tendency will be to disfranchise honest men, and induce dishonest men to perjure themselves.

Section 13, in reference to removals from one precinct to another, and the necessary steps to become registered in such cases, seems to me most unreasonable and unnecessary; but perhaps this is within the power of the Legislature, as it is not absolutely impossible to comply with it.

But, in relation to naturalized voters, the very men who have probably lost their certificates, and cannot now replace them, are elderly men, who have been naturalized for many years, and have exercised the elective franchise in Detroit, without question, for upward of a quarter of a century. They have, many of them, no doubt, forgotten the particular name of the court in which they took out their papers; and to prove their issue by some one other than themselves would be, in some instances, impossible. A law that treats these men as men whose oaths cannot be taken in their own interest, while it permits a native-born citizen to prove his standing as a voter by his own testimony, cannot receive my sanction, as I believe such a requirement to be not only unjust, but unconstitutional, unless applied to all. Another distinction may also be noted. A native-born citizen, becoming of age between the last day of registration and the election, is permitted to vote; but a foreign-born citizen, who has taken out his first papers, and whose right to full citizenship or the elective franchise will ripen between the completing of the registry list and the opening of the polls, cannot vote.

In this minute and detailed plan of registration, with its provisions for an elaborate registry book, only two classes of voters are recognized, to wit, native-born and naturalized. Three classes of electors, under the Constitution, are provided for, unless Indians are to be classed with the native-born citizens without any particular designation of their own, and the male inhabitant residing here in 1850, who had declared his intention six months before an election, is to be classed with naturalized voters, and treated the same as the rest. But it is quite possible that there are persons now living in the city of Detroit who were "white male inhabitants" of this State in 1835. A man 21 years old then would be 75 now. This class were not required to be native-born, nor naturalized. They were made voters because they resided here at that date. There seems to be no place for such as these in this registry law, unless they are native-born, or can establish their naturalization. And it is by no means certain that the term "inhabitant" would not include all those who had a residence or fixed settlement and home in Michigan in 1835, although not then of age, if they have since lived in Michigan. If so, a larger number of voters would be affected by this act, as, strictly following the law, they are disfranchised by it.

In my opinion, no registry law is valid which deprives an elector of his constitutional right to vote by any regulation with which it is impossible for him to comply. No elector can lose his right to vote, the highest exercise of the freeman's will, except by his own fault or negligence. If the Legislature, under the pretext of regulation, can destroy this constitutional right by annexing an additional qualification as to the number of days such voter must reside within a precinct before he can vote therein, or any other requisite, in direct opposition to any of the constitutional requirements, then it can as

well require of the elector entirely new qualifications, independent of the Constitution, before the right of suffrage can be exercised. If the exigencies of the times are such, which I do not believe, that a fair and honest election cannot be held in Detroit, or in any other place in our State, without other qualifications and restrictions upon both native-born and naturalized citizens than those now found in or authorized by the Constitution, then the remedy is with the people to alter such Constitution by the lawful methods pointed out and permitted by that instrument.

This disposition to hamper and abridge the rights of the people to govern themselves, upon the theory that certain communities are unfit to control their own local affairs, which seems to be growing more prevalent in our legislative bodies in this country, must, nevertheless, if the idea be a correct one, be exercised in reason, and within constitutional limits.

This law being, in the respects pointed out, both unreasonable and in conflict with the Constitution, and it being apparent that the Legislature would not have enacted the other portions of the act had it foreseen that the courts would declare these parts unconstitutional, the whole act must fall, and be held unconstitutional and void. *Dells v. Kennedy*, 49 Wis. 560, and cases cited; *Daggett v. Hudson*, 43 Ohio St. 561; *Brooks v. Hydorn*, 76 Mich. 273 (42 N. W. Rep. 1122).

The other Justices concurred.