(No. 6630.   September 29, 1938.)

HARRY L. FISHER, Plaintiff, v. IRA H. MASTERS, Secretary of State of the State of Idaho, BARZILLA W. CLARK, Governor of the State of Idaho, HARRY C. PARSONS, Auditor of the State of Idaho, MYRTLE P. ENKING, Treasurer of the State of Idaho, and J. W. TAYLOR, Attorney General of the State of Idaho, Constituting the State Board of Canvassers of the State of Idaho, and IRA H. MASTERS, Secretary of the State of Idaho, Defendants, CHARLES F. KOELSCH and CHARLES E. WINSTEAD, District Judges of the Third Judicial District, State of Idaho, Intervenors.

[83 Pac. (2d) 212.]

Harry L. Fisher, Plaintiff, *pro se.*

J. W. Taylor, Attorney General, and E. G. Elliott and L. B. Quinn, Assistant Attorneys General, for Defendants.

Jess Hawley and E. P. Barnes, for Intervenors.

J. P. Reed, *Amicus Curiae.*

AILSHIE, J.—This is an application for writ of mandate to the secretary of state to require him to certify plaintiff's name to the various county auditors of the counties of the third judicial district to be printed on the official judicial ballot as candidate for district judge. The third judicial district elects two district judges and it appears from the complaint that at the August primary there were three candi-

dates in nomination and on the ballot. Their names and the votes received by them are as follows:

| Harry L. Fisher, | 5,043 |
| Charles F. Koelsch, | 11,537 |
| Charles E. Winstead, | 11,591 |

Plaintiff alleges that under the provisions of sec. 7 of chap. 16 of the 1933 Session Laws, he is entitled to have his name certified and printed on the official ballot at the ensuing November general election. The section of the 1933 statute on which plaintiff relies reads as follows:

"From the candidates receiving the greater number of votes for nomination to the office of district judge, a number equal to twice the number of such offices to be filled at the next general election shall be declared to be the nominees and their names shall be placed on the official judicial ballot at the general election next following."

In answer thereto the secretary of state and the state canvassing board, and Judges Koelsch and Winstead who have intervened, allege and contend that the 1933 statute (chap. 16) has been amended and the provision above quoted entirely changed in pursuance of authority conferred by constitutional amendment adopted at the November election, 1934. The wisdom of nominating and electing judges of our courts on a nonpartisan ticket, freed from partisan politics and the intervention of political parties, had been debated for many years in this state and finally in 1933 the legislature enacted such a law which is embodied in chap. 16 of the 1933 Sess. Laws, on which plaintiff relies. That act was upheld by this court in *Koelsch v. Girard,* 54 Ida. 452, 33 Pac. (2d) 816.

A constitutional amendment was submitted to the electors of the state and at the general election, November 6, 1934, was duly and regularly ratified and adopted. The amendment was not a change or modification of any existing provision of the constitution but entirely new and added section 7 to article 6 of the Constitution and is as follows:

"Section 7. The selection of Justices of the Supreme Court and District Judges shall be non-partisan. The Legislature shall provide for their nomination and election, but

candidates for the offices of Justice of the Supreme Court and District Judge shall not be nominated nor endorsed by any political party and their names shall not appear on any political party ticket, nor be accompanied on the ballot by any political party designation.''

This provision of the constitution deals exclusively with judicial nominations and elections.

Following the adoption of the foregoing provision the legislature enacted chapter 12 of the 1935 Session Laws (1935 Sess. Laws, p. 27) and by the provisions thereof specifically repealed all existing laws on the subject in conflict therewith. The title to the 1935 statute, which was evidently intended to carry into effect the provisions of the new section to the constitution, reads as follows:

''AMENDING CHAPTER 16, SESSION LAWS OF 1933, BY CHANGING FORM OF DECLARATION OF CANDIDACY; BY LIMITING THE NAMES OF CANDIDATES APPEARING UPON THE PRIMARY ELECTION BALLOT; BY FIXING THE NUMBER OF CANDIDATES TO BE VOTED FOR AND THE FORM OF BALLOT AND BY PROVIDING THAT EACH CANDIDATE FOR THE OFFICE OF JUSTICE OF THE SUPREME COURT OR DISTRICT JUDGE WHO RECEIVES A MAJORITY, AS HEREIN DEFINED, OF VOTES CAST FOR THE OFFICE FOR WHICH HE IS A CANDIDATE SHALL THEREBY BE ELECTED TO SUCH OFFICE; AND REPEALING ALL ACTS AND PARTS OF ACTS IN CONFLICT HEREWITH.''

Plaintiff now contends and alleges ''That Senate Bill No. 33, which appears in chapter 12, Session Laws of Idaho, 1935, contains section 7; that said section 7 of said act is unconstitutional and void for the following reasons:

1. It attempts to convert a nominating election into a general election.

2. It authorizes a pretended elector, under twenty-one years of age, to vote for and elect a district judge.

3. It authorizes a pretended elector, without six months residence in the State to vote for and elect a district judge.

4. It authorizes a pretended elector, without thirty days residence in the county, to vote for and elect a district judge.''

The contentions of plaintiff as above set forth require solution of the following questions: First, Does the statute convert ''a nominating election into a general election'' for judicial purposes? If so, does such fact run counter to any constitutional requirement? And, second, Does the statute authorize anyone under twenty-one years of age, or who has not resided within the state six months and in the county thirty days, to vote at such election? Answers to these inquiries are interdependent and discussion of one will, in a measure, solve the other.

In the very outset we should observe and at all times be mindful of the fact that the electorate of the state, by the adoption of sec. 7, art. 6 of the constitution, have seen fit to segregate and separate certain judicial offices from partisan and political party nominations and elections; and in doing so they have declared that ''The selection of Justices of the Supreme Court and District Judges shall be nonpartisan.'' Furthermore, they have directed the legislature to specifically and separately provide for the ''nomination and election'' of such officers. They have also declared that no such candidate shall be ''nominated nor endorsed by any political party''; and that ''their names shall not appear on any political party ticket, nor be accompanied on the ballot by any political party designation.''

It is urged, however, that the statute (chap. 12 of the 1935 Sess. Laws) is unconstitutional and void for the reason it provides for a primary or nominating election and not a general election, and that different qualifications are prescribed for voting at an *election* than are required at a *primary* or nominating election; and that under this law a person might vote who was not then twenty-one years of age or who had not resided in the state six months or in the county thirty days, as authorized by the general primary election law (sec. 33–613, I. C. A.), and that a candidate might

be elected to a judgeship by the votes of persons who were not in fact electors within the provisions of the constitution, as prescribed by sec. 2, art. 6. That section provides as follows:

"Except as in this article otherwise provided, every male or female citizen of the United States, twenty-one years old, who has actually resided in this state or territory for six months, and in the county where he or she offers to vote, thirty days next preceding the day of election, if registered as provided by law, is a qualified elector; and until otherwise provided by the legislature, women who have the qualifications prescribed in this article may continue to hold such school offices and vote at such school elections as provided by the laws of Idaho territory."

The foregoing section is followed by section 3 defining "disqualification of certain persons" and which section enumerates a large number of persons who are prohibited from voting, serving on juries or holding any civil office. Then follows section 4 providing as follows:

"The legislature may prescribe qualifications, limitations, and conditions for the right of suffrage, additional to those prescribed in this article, but shall never annul any of the provisions in this article contained."

There has not been called to our attention any other American Constitution which contains the foregoing provision. Reference to the debates had in the constitutional convention confirms that which is well known as a historical fact, that the people of the territory were at the time of the constitutional convention greatly agitated over definite local social and religious issues which lead to the insertion of some of the disqualifications specified in section 3, article 6, above cited. The debates in the convention were earnest and sometimes heated and a substitute was offered for section 4 *limiting its operation to those persons and conditions specified in section 3.* The substitute was rejected by a vote of 36 opposed and 16 in favor of its adoption; and thereupon the section as it now appears in the constitution was adopted by a vote of 42 ayes to 10 nays. Reference to the debates (Idaho Const. Convention, vol. II, pp. 1030 to 1055), will

disclose that it was understood by all members of the convention that sec. 4, art. 6, was intended to place in the hands of the legislature the power to add additional "qualifications, limitations and conditions for the right of suffrage." One of the members of the convention who opposed this constitutional provision declared that it was "one of the most infamous declarations that was ever put into a constitution by any free people." This assault was nevertheless repudiated and the section was supported by many members who were able, distinguished and patriotic pioneers of Idaho Territory, among whom were men who subsequently presided in this court, others who presided over district courts and still others who became governor, senators, representatives in congress and other important officers of trust.

After reading and examining this provision of the constitution and the debates had in the convention, there is no room for doubt but that the framers of the constitution intended to vest in the legislature the power to prescribe *additional* "qualifications, limitations and conditions" for the exercise of the right of suffrage. This view was advanced by the writer in *Adams v. Lansdon,* 18 Ida. 483, 508, 110 Pac. 280, and by Chief Justice McCarthy in *State v. Dunbar,* 39 Ida. 691, 230 Pac. 33. A like view was expressed in *Powell v. Spackman,* 7 Ida. 692, 697, 65 Pac. 503, 54 L. R. A. 378; see, also, *Koelsch v. Girard,* 54 Ida. 452, 33 Pac. (2d) 816. The power conferred by this section, however, is limited by the provisions of sec. 20, art. 1, to the effect that "No property qualification shall ever be required for any person to vote or hold office except in school elections or elections creating indebtedness." (Subsequently amended Nov. 8, 1932). For the foregoing reasons cases from other states not having such constitutional provision holding that the legislature can neither add to nor subtract from the qualifications of electors as defined in the constitution of such states, have no application and furnish slight assistance here. Among the cases cited to that effect are *Spier v. Baker,* 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196; *Johnson v. Grand Forks County,* 16 N. D. 363, 113 N. W. 1071, 125 Am. St. 662, 666; *State v. Huntley,* 167 S. C. 476, 166 S. E. 637, 639; *Attorney-General v. Common Council, etc.,* 78 Mich. 545, 44

N. W. 388, 18 Am. St. 458, 7 L. R. A. 99, 103; *Rouse v. Thompson*, 228 Ill. 522, 81 N. E. 1109, 1115.

It is also contended that sec. 6, chap. 12 of the 1935 Sess. Laws, deprives an elector of a constitutional right, because of the provisions therein that "the ballot shall contain no names not certified by the Secretary of State and no blank spaces for writing in names shall appear on said ballot." It is argued that the elector has a right to vote for anyone whom he may desire elected 'for any given office and that to deny him the right to write in a name or to limit him to those printed on the ballot is an invasion of his constitutional right. As we have already seen, the constitution has empowered the legislature to impose conditions to be observed by the elector as prerequisites to casting his vote for such candidate by provisions of both sec. 4, art. 6, and the new sec. 7, art. 6. No good reason appears why such a "condition" or "limitation" as prescribed by sec. 6, *supra,* may not be imposed on the voter as a prerequisite to casting his vote for any person he may wish elected. As was said by the writer in *Adams v. Lansdon,* 18 Ida. 483, 509, 110 Pac. 280, on consideration of the first primary law adoption in this state: "It sometimes happens that the voter's *first choice* is not a candidate for office, but that does not deprive him of doing the next best thing in *choosing among those who are candidates.*"

The right to vote is not a natural or "unalienable right." It is a franchise or privilege only, resulting from and conferred by organized society. (*Attorney General v. Knight,* 169 N. C. 333, 85 S. E. 418, Ann. Cas. 1917D, 517, 518, L. R. A. 1915F, 898; *Solon v. State,* 54 Tex. Crim. Rep. 261, 114 S. W. 349; *State v. Phelps,* 144 Wis. 1, 128 N. W. 1041, 35 L. R. A., N. S., 353; *Blair v. Ridgely,* 41 Mo. 63, 97 Am. Dec. 248, 255; *Morris v. Colorado Midland Ry. Co.,* 48 Colo. 147, 109 Pac. 430, 139 Am. St. 268, 20 Ann. Cas. 1006, 31 L. R. A., N. S., 1106; 20 C. J., sec. 13, p. 60.) Cooley in his work on Constitutional Law, p. 260, says:

"Suffrage cannot be the natural right of the individual, because it does not exist for the benefit of the individual, but for the benefit of the State itself. Suffrage must come to the individual, not as a right, but as a regulation which

the State establishes as a means of perpetuating its own existence, and of insuring to the people the blessings it was intended to secure. Suffrage is never a necessary accompaniment of State citizenship, and the great majority of the citizens are always excluded, and are represented by others at the polls.''

In *Knight v. Trigg,* 16 Ida. 256, 100 Pac. 1060, this court said: ''The holding of elections is peculiarly and wholly a matter within the management and control of the political department of government.'' The word ''political,'' as used in this connection, has no reference to partisanship or political parties but rather to the control, management and operation of government. ''Belonging to the science of government; treating of polity or politics; as *political* principles. Having an organized system of government; administering a polity; as a fully developed *political* community.'' (Funk & Wagnalls New Stand. Dict.) ''Relating to the management of affairs of state; as political theories.'' (Webster's New Internat. Dict.) Neither the right to vote nor the right to hold office is essential to the ''pursuit of happiness,'' as multitudes have learned.

At common law the right to vote did not exist and the right of suffrage only began to be conferred by governments as they developed into republics and democracies, and then originally only in a limited way. In some places it was limited to male property owners; in other places to certain classes of specially trained citizens, and, indeed, it was rarely extended to women until the last half century. Even now in this the oldest and most stable of republics, fewer than one-half of the people are electors. While the laws govern, protect and apply to all citizens alike, they rest primarily on the will of those upon whom the government confers the elective franchise. In this state, when the framers of the constitution submitted that document, they defined electors by sec. 2, art. 6, *supra,* and limited the franchise to males. Later by an amendment (1896) the right was extended equally to females; but as heretofore observed, the framers were not yet content to leave the matter as defined by sec. 2, art. 6, but deemed it advisable to confer upon the legislature the power to prescribe ''additional qualifications,

limitations and conditions'' for the exercise of the right of suffrage. So that the government must rest upon and be administered by those who have been granted the elective franchise.

The very organization of government implies and carries with it the necessity of limiting the vote in shaping its constitution or organic law to certain persons or classes of persons who are designated *electors*. That was done in the adoption of our own constitution and the organization of state government. The framers of the constitution by sec. 6, art. 21, provided:

''This constitution shall be submitted for adoption or rejection, to a vote of the electors qualified by the laws of this territory to vote at all elections, at an election to be held on the Tuesday after the first Monday in November, A. D. 1889,'' etc.

Now, turning to the territorial statute then in force, defining electors, we find sec. 500 of the Revised Statutes of 1887, prescribes the qualifications of an elector as follows:

''All male inhabitants over the age of twenty-one years, who are citizens of the United States, and have resided in the Territory four months, and in the county where they offer to vote thirty days, next preceding the day of election, 'if registered as in this Code provided,' are entitled to vote at any election for Delegate to Congress, and for Territorial, County, and Precinct officers, except as provided in the next section.''

''The next section,'' (501) above referred to, enumerates a number of persons who are declared disqualified to vote and corresponds in a limited sense to the list of disqualifications prescribed by sec. 3, art. 6, above cited. So it will be seen that the constitution itself, after being framed by a representative body of selected citizens, was then adopted by a limited number of *male citizens* of the then territory. While thus adopted by a limited number of persons designated as ''electors qualified by the laws of the territory to vote at all elections,'' it guarantees *equal rights, privileges and immunities* to all persons within the bounds of the state whether electors or otherwise. (Declaration of Rights; art. 1, Const.)

Now let us inquire into what has been intended as a judicial nomination under sec. 7, art. 6, and the statute enacted thereunder. When the legislature came to the enactment of this statute in compliance with the mandate of the new constitutional plan, for the selection of judicial officers, they provided a method for placing a candidate in nomination by filing a declaration of his desire to become a candidate and his willingness to accept the office of district judge; and then provided that such declaration should be accompanied by signatures of at least one hundred qualified electors of the district, to the effect that the candidate is qualified to hold the office and that they each intend to support him. The statute further provides that a fee shall be paid upon filing the declaration and petition and that "the name of no candidate shall appear upon the primary election ballot who has not complied with this and the foregoing section." The law also provides that "each *voter* shall be entitled to vote for not more than as many candidates as there are offices to be filled." (Sec. 6.) The same section says that

"When an *elector* offers to vote he shall be given one of said judicial nominating ballots in addition to the ballot of the political party of which he is a member. The judges of election shall require every voter to return to the receiving clerk the judicial nominating ballot at the same time he returns his ballot for partisan candidates. The judicial nominating ballot shall be deposited in a separate ballot box from the ballots for partisan candidates, shall be printed upon different colored paper than the ballots for partisan candidates and shall be stamped with a stamp on which shall be printed the words 'Official Ballot.' When returned it must be so folded that the words 'Official Ballot' are on the outside."

The contention that the *voter* or *elector* is denied the right to vote for anyone he desires to support for the office of district judge, whether he has been placed on the ballot in the method prescribed by the statute or not, is fully answered by the fact that any qualified elector has the right to place a candidate in nomination, or at least to participate in placing him in nomination; and if he can secure the requisite number of signatures and the consent of his nominee to run for

the office, he can have his name printed on the ballot. That is as much as one could do at a nominating convention under the old and time-honored system. He could place the name of his candidate before the convention and if he could secure a majority of the votes of the convention, his name would be printed on the ballot; otherwise he failed. Whether he secured enough votes or not, he could at least place his name before the convention and have it voted on. That is as much as the elector is entitled to. That is what he may do under this law if he desires to do so.

Moreover, when we recall that within the third judicial district there are more than 26,000 electors and at the same time there are fewer than 100 persons in the same district who can meet the constitutional qualifications to become a candidate for the office of district judge (sec. 23, art. 5, Const.), we can appreciate at once the futility of allowing every elector in the district to disregard the prescribed method for placing candidates in nomination for these nonpartisan judicial offices by writing in at random whatever name he may choose to select among either the entire electorate of the district or those only who can qualify for such office.

Now it seems clear to us that, under the provisions of this new section of the constitution (sec. 7, art. 6) and the authority of sec. 4, art. 6, *supra,* it was competent for the legislature to provide a method, open to all alike for placing candidates in nomination and having their names printed on the ballot; and that it was equally competent for them to say to the electors that this would be the exclusive method of securing the printing of the names of candidates on the ballot, and that no other method should be employed, and to that end prohibit the leaving of blank spaces for the writing in of names of persons not regularly placed in nomination.

Further objection, however, is made to this statute (chap. 12, 1935 Sess. Laws) that it leaves the elector in doubt and uncertainty as to whether or not he is voting merely to *nominate* a candidate or is voting for his final *election.* This objection appears to be very well answered by the title to the act and various provisions contained in the body thereof. It will be observed from the title above

quoted that the act is intended to limit the number of names of candidates appearing on the official ballot to those only who have been regularly nominated by petition, and to provide "that each candidate for the office of Justice of the Supreme Court or District Judge who receives a majority, as herein defined, of votes cast for the office for which he is a candidate shall thereby be elected to such office"; then after providing the form of the ballot and method of voting, sec. 7 of the act says:

"If any candidate or candidates not exceeding in number the number of offices to be filled shall receive a majority of all votes cast for the office for which he is a nominee, such candidate upon the official canvass thereof shall be certified by the State Board of Canvassers to the Secretary of State as duly elected to such office and shall receive a certificate of election and shall not be required to stand for election at the general election following. For the purpose of determining whether any candidate, or candidates, shall have received a majority of the votes cast under the provisions of this section, the total number of votes cast for all candidates for such office shall be divided by the number of offices to be filled at such election and the resulting number shall, for the purpose of determining a majority, be deemed to be the total vote cast.

. . . . . . . . . . . .

"In the event no candidate, or not sufficient candidates to fill the offices to be filled, receive a majority of all votes cast for the office of District Judge, as herein provided, then from the candidates receiving the greater number of votes for nomination to the office of District Judge, a number equal to twice the number of such offices to be filled at the next general election shall be declared to be nominees and their names shall be placed on the official judicial ballot at the general election next following."

It thus appears that the legislature intended that such election should be a general judicial election and that there should not be any subsequent election for such offices unless "no candidate, or not sufficient candidates to fill the offices to be filled, receive a majority of all votes cast . . . . as herein provided." It will also be observed that the candi-

dates whose names are printed on the ballot to be voted upon at the August primary are referred to as *nominees*. After the first election held under this statute in 1936 it was discovered that where two judges are to be elected and there are three candidates for the office, each of the three candidates might have a majority of all the votes cast under the method prescribed for computing the total vote, and so there would be no election. In order to remedy that defect, the 1937 session of the legislature passed chapter 106 (1937 Sess. Laws, p. 158) amending sec. 7 of chap. 12 of the 1935 Sess. Laws, so as to provide that the candidate should be declared elected to the office ''who received a majority and the greatest number of votes cast for such office''; and that ''in case two offices are to be filled and one or more candidates shall receive a majority of all votes cast, then the said board shall certify to the Secretary of State, as duly elected, the name of the candidate receiving a majority and the greatest number of votes and the name of the candidate, if any, receiving a majority and the next to the greatest number of votes cast'' shall also be declared elected.

The fact that it may become necessary to submit the names of certain of the candidates receiving the highest or next highest number of votes to the general November election following the primary, is not a valid objection to the statute itself, since it is the evident intent of the legislature that no one should be declared elected without receiving a clear majority of all the votes cast. It is an additional means provided to take care of the contingency which arises when there is no election at the primary election. (*McClintock v. Abel*, 21 Cal. App. (2d) 11, 68 Pac. (2d) 273.)

The further objection is urged against this 1935 statute and the amendment thereto as a reason why it cannot be in any sense considered a judicial election, that it permits persons to vote who are not then electors but who will be electors at the time of the ensuing general November election. This objection is based on an assumption which we do not think justified. While it is true that the statute (sec. 33–613, I. C. A.) appears on its face to indicate that anyone who is duly registered and will possess all the qualifications of an elector at the time of the general election in November

may vote at the primary nominating election, it seems clear that the 1935 statute (chap. 12), dealing specifically with the nomination and election of judicial candidates, has limited the qualifications of voters for *judicial candidates at such election to electors only*. Sec. 2 of chap. 12 requires that every signer of a petition, placing a candidate in nomination for a judicial office, must certify that he is "a qualified elector of the State of Idaho, residing within —— judicial district." It further provides that *an elector* shall subscribe an oath to the effect "that each of the persons whose name is affixed to the above paper . . . . is a *qualified elector* of the State of Idaho."

It is provided in sec. 6, a portion of which is above quoted, that "When an *elector* offers to vote he shall be given one of said judicial nominating ballots." The word "elector" as last above used was undoubtedly intentional and meant in its constitutional and legal sense and not merely to indicate any person not so qualified who might be allowed to vote at a primary election. In this connection we pause to call attention to the contention that has been made by *amicus curiae* to the effect that this statute, if held to authorize an election, will result in disqualifying large numbers of voters for the reason, as contended, that the elector is only entitled to receive a judicial ballot who votes the political or party ticket; and that since there are large bodies of people who call themselves socialists, communists, progressives, etc., who decline to participate in the political party election but prefer to avail themselves of the privilege of holding conventions under sec. 33–639, I. C. A., the latter class would therefore be excluded from the right of participating in the election of judges. We think the statute itself refutes this contention. It does not limit the right of the voter to receive a *judicial ballot* to those only who desire to vote a party ticket or for the "partisan candidates." It rather appears to us from the language of the statute that *any elector* who offers to vote is entitled to receive one of the judicial ballots. He may also receive the "political party" ballot or he may decline it. If he does receive it, he is not obliged to vote it. The law simply imposes upon him the duty of returning the ballots to "the receiving clerk." The party ballot is placed in the

ballot box prepared for partisan tickets, and the judicial ballots shall be placed in the ballot box for judicial ballots. The statute requires that they be of different color so that they are readily distinguishable.

The fact, that an elector votes a judicial ballot at the primary election if he declines to receive the political party ballot, does not disqualify him from participating in a convention of his party as authorized by sec. 33–639, *supra*. So we conclude that under this statute *every qualified elector* in the state is entitled to vote a judicial ballot at the primary election at which judges of the district court and supreme court may be elected, although he does not vote for partisan candidates.

The further objection is urged against this being an election as distinguished from a nomination, that, under our statute, there is no provision for contesting a primary election (*Lansdon v. State Board of Canvassers,* 18 Ida. 596, 605, 111 Pac. 133) and that therefore there is no means provided for relief against the receiving and counting by the election offices of illegal votes. The answer to this contention may be found in what we have already said, to the effect that *this is an election as to any candidate who receives a majority and the highest number of votes cast* and as to any such candidate of course the contest statute (chap. 17, Title 33, I. C. A.) would apply. (See *McClintock v. Abel, supra.*)

The alternative writ will be quashed and the case will be dismissed, and it is so ordered.

Holden, C. J., and Morgan, Budge and Givens, JJ., concur.