KELLY, J.
(dissenting). This case involves the constitutionality of mandating that registered voters show photographic identification before being allowed access to the voting booth. Under 2005 PA 71, if a voter is unable to show the required identification, he or she must sign an affidavit swearing to that fact in order to vote.
This new law impinges on the fundamental right to vote. Before today, this Court consistently applied a strict scrutiny analysis to any law or regulation that impinged on that right. But, in upholding the constitutionality of 2005 PA 71, the majority announces that strict scrutiny is now the wrong test. Relying on the United States Supreme Court’s decision in Burdick v Takushi,[1] it concludes that a number of this Court’s past voters’ rights decisions no longer are good law. Because I disagree, I respectfully dissent.
First, Burdick did not signal a change in the law. It was simply a clear articulation of the rule that emerges from synthesizing earlier United States Supreme Court decisions in this area. Burdick also did not overrule past decisions of either the United States Supreme Court or this Court. A proper application of the law declared in these decisions convinces me that 2005 PA 71 is unconstitutional. It is a serious error for the Michigan Supreme Court to ignore this long-revered caselaw.
Second, the majority of this Court has uncritically adopted what it believes is a rule mandated by the *81 federal constitution. In so doing, it essentially confers on the United States Supreme Court the functional ability to amend our state constitution. The majority’s decision to adopt in lockstep what it mistakenly believes is the federal standard renders our state constitutional provisions nugatory. And it represents a failure of this Court to fulfill its constitutional duty.
In reliance on the Michigan Constitution and the caselaw interpreting it, I would hold that infringements on the right to vote that cannot withstand the most exacting scrutiny are unconstitutional. Because 2005 PA 71 infringes on the right to vote and is not narrowly tailored to achieve a compelling governmental interest, it is unconstitutional under both the federal and the state constitutions.
I. THE FACTS
The legal question that we are considering here has its genesis in MCL 168.523, § 523 of the Michigan Election Law,[2] which was enacted by the Legislature in 1996 PA 583. Section 523(1) requires that each voter identify himself or herself by
presenting an official state identification card issued to that individual pursuant to Act No. 222 of the Public Acts of 1972, being sections 28.291 to 28.295 of the Michigan Compiled Laws, an operator’s or chauffeur’s license issued to that individual pursuant to the Michigan Vehicle Code, Act No. 300 of the Public Acts of 1949, being sections 257.1 to 257.923 of the Michigan Compiled Laws, or other generally recognized picture identification card ....
Section 523(1) also provides:
If the elector does not have an official state identification card, operator’s or chauffeur’s license as required in *82 this subsection, or other generally recognized picture identification card, the individual shall sign an affidavit to that effect before an election inspector and be allowed to vote as otherwise provided in this act. However, an elector being allowed to vote without the identification required under this subsection is subject to challenge as provided in section 727.
Pursuant to these requirements, before being given a ballot, each registered voter would have to identify himself or herself by presenting (1) an official state identification card, (2) an operator’s or chauffeur’s license, or (3) another generally recognized picture identification card. If the voter did not have the required photo identification, the voter would have to sign an affidavit swearing to his or her identity. If the voter complied, he or she would be allowed to vote, but would be subject to challenge under MCL 168.727, in which case, the right to vote might be denied. It is not clear what would happen if a registered voter had photo identification but was not in possession of it at the polling place.
Before the requirements of § 523 became effective, then-Attorney General Frank J. Kelley evaluated it pursuant to MCL 14.32 and found that the photo identification requirements violated the Equal Protection Clause of the United States Constitution, US Const, Am XIV OAG, 1997-1998, No 6930, p 1 (January 29, 1997). As a result, § 523 was never implemented or enforced.
Nine years later, the Legislature enacted 2005 PA 71. The new act essentially repeated the same requirements that were in the version of § 523 enacted in 1996 PA 583. In February of the next year, the Michigan House of Representatives, by resolution, asked this Court to issue an opinion on the constitutionality of *83 2005 PA 71. See 2006 House Journal 17 (Resolution No. 199, February 21, 2006). We granted the request. 474 Mich 1230 (2006).
As a consequence, the question before us is the constitutionality of 2005 PA 71. It is beyond argument that the photographic identification requirements of the act infringe on the paramount and fundamental right to vote. Nonetheless, a majority of this Court has decided that these requirements will pass constitutional muster if they can withstand only a minimal level of scrutiny. I do not agree. For the reasons that follow, I would hold that the requirements of the act violate both the federal and state constitutions.
II. THE UNITED STATES CONSTITUTION
The United States Supreme Court has stated on many occasions that the right to vote is fundamental. E.g., Anderson v Celebrezze, 460 US 780; 103 S Ct 1564; 75 L Ed 2d 547 (1983); Reynolds v Sims, 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964); Yick Wo v Hopkins, 118 US 356; 6 S Ct 1064; 30 L Ed 220 (1886). “No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.” Wesberry v Sanders, 376 US 1, 17; 84 S Ct 526; 11 L Ed 2d 481 (1964). Because this right is so precious, federal courts have consistently applied the most demanding level of scrutiny to governmental action that interferes with access to the voting booth. See, e.g., Dunn v Blumstein, 405 US 330; 92 S Ct 995; 31 L Ed 2d 274 (1972); Kramer v Union Free School Dist No 15, 395 US 621; 89 S Ct 1886; 23 L Ed 2d 583 (1969).
The majority acknowledges that the right to vote is of fundamental importance. But it has decided that, be *84 cause of the United States Supreme Court’s decision in Burdick, a more relaxed standard now applies to governmental measures that limit the right to cast a ballot. The majority is badly mistaken.
A. BURDICK v TAKUSHI
At issue in Burdick was Hawaii’s prohibition on write-in voting. Burdick, 504 US at 430. Under Hawaii election law, write-in votes were simply ignored. Id. at 436. The plaintiff filed suit, claiming that the prohibition violated his rights under the First and Fourteenth amendments. Id. at 430.
The Court stated the standard to be applied in analyzing whether a voting regulation unconstitutionally infringes on these rights:
A court considering a challenge to a state election law must weigh “the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate” against “the precise interests put forward by the State as justifications for the burden imposed by its rule,” taking into consideration “the extent to which those interests make it necessary to burden the plaintiffs rights.” [Id. at 434 (citations omitted).]
The Court explained that the rigorousness of the Court’s scrutiny depends on the degree to which voting restrictions burden the right to vote. If that right is severely restricted, the restrictions, to be constitutional, must be drawn narrowly so as to advance a state interest of compelling importance. Id. But, when the restrictions impose only “ ‘reasonable, nondiscriminatory restrictions’ upon the First and Fourteenth Amendment rights of voters, ‘the State’s important regulatory interests are generally sufficient to justify’ the restrictions.” Id. (citations omitted). The Court *85 found that Hawaii’s prohibition did not violate the plaintiffs constitutional rights because it created a minor burden while promoting the state’s legitimate interest. Id. at 430.
A majority of this Court has concluded that the decision in Burdick worked a dramatic shift in the law. In fact, it asserts that Burdick repudiated a previous construction of the federal Equal Protection Clause that was erroneous.
The majority has misread Burdick. The case broke no new ground. Rather than create a new rule or signal a shift in the law, Burdick simply announced a rule that synthesized past decisions of the United States Supreme Court and articulated, in one test, already established legal principles.[3]
Contrary to the majority’s claim, the federal constitution has never required that every law regulating elections must withstand strict scrutiny. E.g., Jenness v Fortson, 403 US 431, 440-442; 91 S Ct 1970; 29 L Ed 2d 554 (1971);[4] Storer, 415 US at 730;[5] Anderson, 460 US *86 at 788.[6] Rather, the federal constitution has consistently been interpreted to require application of a strict scrutiny analysis only if the right to vote has been subjected to a severe restriction. Cases both predating and postdating Burdick illustrate that statutes that impair an individual’s right to cast a ballot, as 2005 PA 71 does, are severe restrictions.[7]
*87 B. HARPER v VIRGINIA BD OF ELECTIONS[8]
In Harper, the Supreme Court found that Virginia’s poll tax requirement for state elections violated the Equal Protection Clause. 383 US at 666. It made clear that it greatly disfavors requirements not related to one’s ability to participate intelligently in the electoral process and that threaten to deprive one of the right to vote. Id. at 668. When such requirements are at issue, the Court declared, the degree to which the right to vote is impaired is irrelevant. Id. If the regulation is not narrowly tailored to achieve a compelling governmental interest, even a small impairment will violate the Equal Protection Clause. Id.
C. KRAMER v UNION FREE SCHOOL HIST NO 15
Similarly, in Kramer, a bachelor living with his parents challenged a New York law. It limited the individuals eligible to vote in school district elections to owners of property within the district and parents of children enrolled in the local public schools. Kramer, 395 US at 622. The Court considered whether the limitations violated the Fourteenth Amendment. Id. at 626. The Court concluded that “if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.” Id. at 627.
D. DUNN v BLUMSTEIN
And in Dunn, the United States Supreme Court struck down a durational residency requirement. 405 *88 US at 333. It found that any one citizen in the jurisdiction has a constitutionally protected right to participate in elections on an equal basis with any other citizen in the jurisdiction. Id. at 336. And before that right may be restricted, the purpose of the restriction and the overriding interests served by it must meet close constitutional scrutiny. Id. The Court found that strict scrutiny “is required for any statute that ‘placets] a condition on the exercise of the right to vote.’ ” Id. at 337, quoting Bullock v Carter, 405 US 134, 143; 92 S Ct 849; 31 L Ed 2d 92 (1972).
The majority ignores each of these pre-Burdick cases because it believes that Burdick signaled a shift in the law. But Burdick did no more than clearly articulate the law as it existed at the time it was written. It did nothing to overrule prior decisions.[9] And, the United States Supreme Court’s post-Burdick decision in Bush v Gore[10] confirms that a restriction works a severe burden and is subject to strict scrutiny if it interferes with an individual’s right to cast an equal ballot.
E. BUSH v GORE
In Bush, the Court considered whether Florida’s manual recount of ballots violated the Fourteenth Amendment. The standard for what qualified as a legal vote differed from county to county. Bush, 531 US at 103. In deciding the case, the Court noted that one source of the fundamental nature of the right to vote “lies in the equal weight accorded to each vote and the *89 equal dignity owed to each voter.” Id. at 104. Because “[t]he right to vote is protected in more than the initial allocation of the franchisee, e]qual protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person’s vote over that of another.” Id. Ultimately, the Court held that the recount of votes was unconstitutional because the lack of a clear standard permitted an unequal evaluation of the ballots. Id. at 110.
Though factually distinguishable from the instant case, Bush is relevant because it is the only postBurdick United States Supreme Court decision involving an individual’s right to cast an equal ballot.[11] The Bush Court peremptorily dismissed the state interests that were asserted and struck down the recount. In so doing, it had to have used a strict scrutiny standard.[12] Hence, the Bush decision stands as reassurance that the pre-Burdick decisions that applied a strict scrutiny analysis to infringements of a voter’s right to cast a ballot are still good law.[13]
*90 F. THE PHOTO IDENTIFICATION REQUIREMENTS
At this time, the Secretary of State estimates that 370,000 Michigan registered voters do not have photo identification.[14] The photographic identification requirements of 2005 PA 71 mandate that these individuals obtain photographic identification or sign an affidavit before they can vote. The teaching of the United States Supreme Court’s decisions in Harper, Kramer, Dunn, Bush, and their progeny[15] is that these requirements work a severe burden on the right to vote.[16]
Because “equal dignity [is] owed to each voter,”[17] the most “exacting test is required for any statute that *91 ‘placets] a condition on the exercise of the right to vote.’ ” Dunn, 405 US at 337 (quoting Bullock, 405 US at 143) (emphasis added). Where access to the ballot box is impeded because of qualifications or requirements, such as (1) the poll tax in Harper, (2) the property-ownership requirement in Kramer, (3) the durational residency requirement in Dunn, or (4) the photo identification and affidavit requirements in this case, the most exacting level of scrutiny must be applied.
G. THE AFFIDAVIT OPTION OF 2005 PA 71
The majority concludes that it is because 2005 PA 71 includes the affidavit option that a minimal level of review of the photo identification requirement is appropriate. However, the affidavit option itself interferes with the right of individuals lacking photo identification to cast a ballot. The assistant attorney general who argued in support of the constitutionality of the act concedes this point. Even if, as the majority asserts, signing an affidavit were a minor obstacle, it is an obstacle that is imposed on only a select group of otherwise qualified voters.
“[W]here a law classifies in such a way as to infringe constitutionally protected fundamental rights, heightened scrutiny under the Equal Protection Clause is required.” New York Attorney General v Soto-Lopez, 476 US 898, 906 n 6; 106 S Ct 2317; 90 L Ed 2d 899 (1986). And a restriction that burdens the right of only a select group of citizens to access the ballot is sufficient to trigger strict scrutiny review under the federal constitution. See, e.g, Harper, 383 US at 670;[18] Wesberry, 376 *92 US at 17-18;[19] Nowak & Keeton, Constitutional Law (5th ed), § 14.31, p 866.[20] As the Burdick Court itself stated, a lower standard of review will apply only to “ ‘nondiscriminatory restrictions.’ ” Burdick, 504 US at 434 (citation omitted). Because only individuals without photo identification will be subject to the affidavit process, these requirements clearly discriminate between individuals with photo identification and individuals without such identification.[21] Therefore, contrary to the position of the majority, the affidavit option does nothing to reduce the level of scrutiny that applies to 2005 PA 71.
H. THE RELEVANT COMPELLING GOVERNMENTAL INTEREST
When strict scrutiny applies, “a heavy burden of justification is on the State, and... the statute will be closely scrutinized in light of its asserted purposes.” Dunn, 405 US at 343. The state must demonstrate that 2005 PA 71 is “ ‘necessary to promote a compelling governmental interest.’ ” Id. at 342, quoting Shapiro v Thompson, 394 US 618, 634; 89 S Ct 1322; 22 L Ed 2d 600 (1969) (emphasis omitted); Kramer, 395 US at 627. And even if a compelling interest can be shown, the state must use the least restrictive means to advance that interest.
[T]he State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Stat *93 utes affecting constitutional rights must be drawn with “precision,” and must be “tailored” to serve their legitimate objectives. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose “less drastic means.” {Dunn, 405 US at 343 (citations omitted).]
The interest that has been put forth for the photo identification requirements is that they will prevent voter fraud. The prevention of voter fraud is clearly a legitimate governmental objective. But, there is no evidence at present that voter fraud is a significant problem in Michigan. In fact “Michigan enjoys an election history that is relatively fraud-free.” Bay Co Democratic Party v Land, 347 F Supp 2d 404, 437 (ED Mich, 2004) (citing Attorney General Opinion No 6930). And voter fraud appears to be very low nationally, as well.[22]
*94 More fundamentally, there are many types of voter fraud. 2005 PA 71 addresses only one: in-person polling place fraud that involves the impersonation of a registered voter. Yet, those arguing in favor of the photo identification requirements have not come forward with any documented instances of in-person voter fraud.[23]
Accordingly, the photo identification requirements are a solution in search of a problem. This is a particularly serious matter given that they affect and hinder the exercise of the fundamental constitutional right to vote. In order for the restrictions to withstand challenge, a constitutionally sufficient compelling governmental interest would have to be shown. But such an interest is conspicuously absent in this case.
I. THE LEAST RESTRICTIVE MEANS
Even assuming a constitutionally sufficient justification could be shown, the government must employ the least restrictive means of furthering that interest. The photo identification and affidavit requirements are not the least restrictive means. The goals of2005 PA 71 may be achieved by more limited means that do not discriminate against and threaten to disenfranchise a large number of qualified Michigan voters. First, Chapter XXIII of the Election Law, MCL 168.491 to 168.524, already establishes comprehensive safeguards aimed at preventing fraudulent voting. The fact that there are no documented cases of in-person voter fraud suggests *95 that these less drastic, nondiscriminatory means have adequately advanced the state’s interest.
Another safeguard is the matching of signatures. In states that utilize voter signature matching, each voter is required to sign the poll sheet. The signature is then matched against the signature acquired at registration. Michigan utilizes this method in precincts where digital signatures are available. MCL 168.523. A less restrictive alternative to the photo identification requirements would be to ensure that all precincts have digital signatures available.[24]
Another safeguard is to permit voters the use of nonphoto identification. Seventeen states utilize this method.[25] If Michigan were to allow flexible nonphoto identification, it would avoid the prejudice to eligible voters who lack state-issued photo identification.
Unlike the above safeguards, the photo identification requirements of 2005 PA 71 pose an extreme remedy to an unsubstantiated problem. When the remedy causes a greater harm than the problem, it cannot survive strict scrutiny. All the aforementioned options represent less drastic means to accomplish the state’s interest in preventing voter fraud. Hence, the photo identification requirements are not the least restrictive means to advance the asserted state interest. For the reasons I have detailed, 2005 PA 71. violates the federal constitution.
*96 III. THE MICHIGAN CONSTITUTION
A complete analysis of 2005 PA 71 must also include consideration of the Michigan Constitution. “State courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the [United States] Supreme Court’s interpretation of federal law.”[26]
That the state constitution requires an independent interpretation is not a novel concept. For much of the nation’s history, state constitutions have been invoked to protect individual rights and often have been found to provide greater protection than the federal constitution.[27] The idea that state courts are not only free to interpret their constitutions independently, but have a duty to do so, is derived from federalism itself.[28]
James Madison acknowledged this principle when he stated, “In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the position allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.”[29] The Federalist No. 51.
*97 In Sitz v Dep’t of State Police,[30] this Court thoughtfully explained the role that the federal constitution plays in interpreting our state constitution.
Where a right is given to a citizen under federal law, it does not follow that the organic instrument of state government must be interpreted as conferring the identical right. Nor does it follow that where a right given by the federal constitution is not given by a state constitution, the state constitution offends the federal constitution. It is only where the organic instrument of government purports to deprive a citizen of a right granted by the federal constitution that the instrument can be said to violate the constitution.
... As a matter of simple logic, because the texts were written at different times by different people, the protections afforded [by the two constitutions] may be greater, lesser, or the same. [Sitz, 443 Mich at 760-762.]
When interpreting our constitution, therefore, “[t]he right question is not whether [the] state’s guarantee is the same as or broader than its federal counterpart as interpreted by the [United States] Supreme Court. The right question is what the state’s guarantee means and how it applies to the case at hand.”[31] And though the United States Supreme Court’s interpretation of the federal constitution may be a polestar to help us navigate to the correct interpretation of our constitution, it is no more than that. Ultimately, it is our constitutional duty to independently interpret the Michigan Constitution.
*98 The Michigan Supreme Court has long recognized the duty by engaging in a “searching examination to discover what ‘law the people [of Michigan] have made.’ ” Sitz, 443 Mich at 759 (citation omitted). As Chief Justice Cooley correctly stated well over 100 years ago, the state Supreme Court’s “duty is to enforce the law which the people have made, and not some other law which the words of the constitution may possibly be made to express.” People v Harding, 53 Mich 481, 485; 19 NW 155 (1884).
Hence we must determine what level of protection the people of Michigan have provided against infringements on the-right to vote. The surest way to answer this question is to examine the specific provisions of the Michigan Constitution dealing with that right.
A. ARTICLE 2, SECTION 1
Article 2, § 1 of the Michigan Constitution states that “[e]veiy citizen of the United States who has attained the age of 21 years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution.” By its terms, this clause provides that individuals who have met certain requirements are “qualified to vote.”
In giving meaning to the phrase “qualified to vote,” this Court “discerns the common understanding of constitutional text by applying [the] term’s plain meaning . ...” Wayne Co v Hathcock, 471 Mich 445, 468-469; 684 NW2d 765 (2004). The word “qualified” is defined as “having met the conditions required by law or custom for exercising a right, holding an office, etc.” Random House Webster’s College Dictionary (2001). *99 Article 2, § 1, therefore, expressly confers the right to vote on any United States citizen, age 21 or older, who has been a Michigan resident for six months, and who meets local residency requirements.[32] The question then becomes whether the photo identification and affidavit requirements unconstitutionally infringe on this right.
When the constitutionality of legislation is examined, a showing of “[different degrees of state interest [is] required by the courts, depending upon the type of private interest which is being curtailed.” Kropf v Sterling Hts, 391 Mich 139, 157-158; 215 NW2d 179 (1974). The strict scrutiny standard of review applies to “legislation [that] impinge[s] on a fundamental right explicitly or implicitly guaranteed by the constitution.” In re Kasuba Estate, 401 Mich 560, 570; 258 NW2d 731 (1977); Kropf, 391 Mich at 157-158. Because our constitution expressly confers the right to vote on individuals who have satisfied the requirements of art 2, § 1, any *100 infringement on that right, beyond these requirements, is subject to strict scrutiny review.[33]
B. WILKINS v ANN ARBOR CITY CLERK[34]
It is consistent with the decisions of this Court that infringements on the right to vote not in art 2, § 1 are invalid under the Michigan Constitution, unless they withstand the most exacting review. For example, in Wilkins, this Court considered whether a statute that precluded certain students from registering to vote in the state violated the Equal Protection Clause of the state constitution.[35] Wilkins, 385 Mich at 675-676. We held that the constitution “guards against subtle restraints on the right to vote, as well as outright denial”[36] and actual denial of the right need not be shown in order for strict scrutiny review to be required. Id. at 685. The statute at issue in Wilkins placed a burden on the students’ right to vote. There were less restrictive ways of accomplishing the state interests of preventing voter fraud and providing for an educated electorate. Hence the Court found that the statute violated the Equal Protection Clause of the state constitution.[37] Id. at 694.
*101 C. MICHIGAN STATE UAW COMMUNITY ACTION PROGRAM COUNCIL v SECRETARY OE STATE[38]
Similarly, in Michigan State UAW, this Court considered whether a statute automatically disqualifying inactive voters violated art 2, § 1 of the Michigan Constitution. Michigan State UAW, 387 Mich at 513. After emphasizing the fundamental importance of the right to vote, we found that the law was unconstitutional, unless it was supported by a compelling state interest. Id. at 514. Indeed, the Court held that “[a]ny burden, however small, will not be permitted unless there is demonstrated a compelling state interest.”[39] Id. at 516.
*102 The government had argued that it was within the Legislature’s powers under art 2, § 4 of the Michigan Constitution to disqualify inactive voters. Article 2, § 4 authorizes the enactment of “laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting.” Michigan State UAW, 387 Mich at 515. This Court rejected that argument, finding that “the state still must demonstrate a compelling state interest to justify a law passed pursuant to this section.” Id. at 516. And, because a comprehensive set of safeguards were already in place to accomplish the purported governmental interest of preventing voter fraud, this Court struck down the statute as unconstitutional.[40] Id. at 517-520.
D. SOCIALIST WORKERS PARTY v SECRETARY OF STATE[41]
In Socialist Workers Party, at issue was a statute requiring new political parties to meet both a petition requirement and a minimum-primary-vote requirement to appear on the general election ballot. Socialist Workers Party, 412 Mich at 580. Again, the plaintiffs *103 argued that the requirements violated the Equal Protection Clause of the state constitution. Id. at 582. This Court agreed, determining the requirements unconstitutional because they were not narrowly tailored to achieve a compelling state interest.[42] Id. at 594. The Court held, also, that the law violated art 2, § 4 of the Michigan Constitution, the “ ‘purity of elections’ ” clause. Socialist Workers Party, 412 at 599.
In deciding that the statute violated the Purity of Elections Clause, the Court recognized that the clause embodies “two separate concepts: first, that the constitutional authority to enact laws to preserve the purity of elections resides in the Legislature; and second, ‘that any law enacted by the Legislature which adversely affects the purity of elections is constitutionally infirm.’ ” Id. at 596 (citation omitted). The Court found that a law that undermined the fairness and evenhandedness of an election would be invalid. Id. at 598-599. And, because the statute at issue gave parties already established an advantage over new parties, the Court held that the statute violated the clause. Id.
This Court’s decisions in Wilkins, Michigan State UAW, and Socialist Workers Party stand for the proposition that any infringement on the right to vote, however minor, is subject to strict scrutiny under the *104 Michigan Constitution.[43] These decisions also illustrate the proper role of the Purity of Elections Clause. The Legislature is free to enact new laws under this clause, but any legislation that threatens to disenfranchise voters or that undermines the fairness of an election will be invalid.
The requirements at issue in the instant case infringe on the right to vote by creating an obstacle that burdens the right of qualified voters to cast a ballot. Hence, the teaching of Wilkins, Michigan State UAW, and Socialist Workers Party is that these requirements are unconstitutional, unless they are narrowly tailored to achieve a compelling governmental interest.
E. FACTORS TO BE WEIGHED
We are required by the language of our state constitution and the decisions of this Court interpreting that language to find that infringements on the right to vote are subject to strict scrutiny. But an additional reason supports that finding. On past occasions, this Court has cited factors that are helpful in determining when it is *105 appropriate to find that the state constitution affords more protection than its federal counterpart. When these factors are weighed, it is apparent that our state constitution affords greater protection against infringements on the right to vote than does the federal constitution.[44]
The factors are (1) the textual language of the state constitution, (2) significant textual differences between parallel provisions of the two constitutions, (3) structural differences between the state and federal constitutions, (4) state constitutional and common-law history, (5) state law preexisting adoption of the relevant constitutional provision, and (6) matters of peculiar state or local interest. Sitz, 443 Mich at 763 n 14.
Article 2, § 1 of the Michigan Constitution expressly confers the right to vote on individuals who satisfy the requirements set forth in that section. This is a difference between the Michigan Constitution and the federal constitution. The federal constitutional provisions regarding the right to vote prohibit denial of the right on the basis of certain protected characteristics. But the federal constitution does not expressly give anyone the right to vote.[45] San Antonio Independent School Dist v Rodriguez, 411 US 1, 34 n 74; 93 S Ct 1278; 36 L Ed 2d 16 (1973). The fact that the Michigan Constitution confers the right to vote on qualified electors while the *106 federal constitution does not, supports the conclusion that the Michigan Constitution affords greater protection than its federal counterpart.
The language of the Michigan Constitution also differs from the federal constitution in that the Michigan Equal Protection Clause[46] protects “political rights,” whereas the federal Equal Protection Clause[47] does not. Additionally, art 1, § 1 of the Michigan Constitution *107 declares that “[a]ll political power is inherent in the people.” The federal constitution contains no analogous provision.
There are also structural differences between our constitution and the federal constitution that indicate that the state constitution provides greater protection against infringements on the right to vote. Unlike the federal constitution, the Michigan Constitution dedicates an entire article to elections.[48] This signifies the importance that Michigan people attach to the right to vote. The federal constitution contains no parallel article regarding elections.
Another difference is that, unlike federal caselaw, the decisions of this Court have uniformly held that infringements on the right to vote are subject to strict scrutiny. Before today, in every case decided under the current state constitution, this Court applied strict scrutiny to statutes that impaired the right to vote. See Wilkins, Michigan State UAW, and Socialist Workers Party. On the other hand, the federal courts have long recognized that different levels of scrutiny will apply depending on how significant the burden is. See, e.g., Storer, 415 US at 730; Anderson, 460 US at 788.
And even long before the ratification of our current constitution, this Court recognized the fundamental and paramount nature of the right to vote, explaining that “[n]o elector can lose his right to vote, the highest exercise of the freeman’s will, except by his own fault or negligence.” Attorney General, ex rel Conely v Detroit Common Council, 78 Mich 545, 563; 44 NW 388 (1889). This Court’s decision in the Detroit case suggested, also, that the appropriate recourse for those seeking to *108 prevent fraud by imposing an identification requirement is a constitutional amendment, not legislation.
If the exigencies of the times are such, which I do not believe, that a fair and honest election cannot be held in Detroit, or in any other place in our State, without other qualifications and restrictions upon both native-born and naturalized citizens than those now found in or authorized hy the Constitution, then the remedy is with the people to alter such Constitution by the lawful methods pointed out and permitted by that instrument. [Id. at 564.]
Accordingly, for well over 100 years, this Court has held that restrictions that threaten to disenfranchise otherwise eligible voters are invalid, absent a constitutional amendment or a compelling governmental interest. This fact weighs heavily in favor of finding greater protection under the state constitution.
Finally, voting is fundamentally a matter of local concern. The federal constitution leaves the regulation of elections largely to the states. The Elections Clause of the federal constitution provides that the state legislatures shall prescribe the “Times, Places and Manner of holding Elections for Senators and Representatives .. . .” US Const, art I, § 4, cl 1. The individual states have complete control, also, over the election process for state offices. Tashjian v Republican Party of Connecticut, 479 US 208, 217; 107 S Ct 544; 93 L Ed 2d 514 (1986).
The fact that the states are granted such broad regulatory power indicates that this is an area where state constitutions likely include greater protection against potential abuses. This is confirmed by the fact that the Michigan Constitution expressly sets forth the qualifications for voting, whereas under the federal system, qualifications are left to legislative determination. Compare US Const, art I, § 2, which provides that *109 federal electors must be equivalent to those for state positions, with Const 1963, art 2, § 1, which provides that an individual who meets certain requirements is qualified to vote. Because the federal constitution leaves the regulation of elections largely to the states, it makes sense that the state constitutions would provide greater protection against potential election abuses.
For all of the above reasons, I would hold that any infringement on the right to vote is unconstitutional under the Michigan Constitution, unless it can withstand the most exacting scrutiny. The photo requirements of 2005 PA 71 infringe on the fundamental right to vote and, as demonstrated in the preceding section, are not narrowly tailored to achieve a compelling state interest. Hence, I would declare these requirements unconstitutional.[49]
The majority disagrees with my conclusion and finds that the Michigan Constitution affords no greater protection against regulations that burden the right to vote than does the federal constitution. But, in deciding that 2005 PA 71 does not violate the Michigan Constitution, the majority simply follows federal precedent in lockstep. I strongly disagree with this approach. It is the functional equivalent of giving the United States Supreme Court the ability to amend the Michigan Constitution. To quote Justice Dennis of the Louisiana Supreme Court, “my colleagues have sunk this court to the lowest pitch of abject followership. They no longer believe in our state constitution as an act of fundamental self-government by the people .... They no longer perceive this court to be the final arbiter of the meaning *110 of that constitution, bound by the intent of the drafters and ratifiers as reflected by the text, the drafting history, and this court’s constitutional precedents. Instead, for them, our state constitution is a blank parchment fit only as a copybook in which to record the [decisions of the United States Supreme Court.]” State v Tucker, 626 So 2d 707, 719 (La, 1993).
IV CONCLUSION
A review of the United States Supreme Court decision in Burdick shows that strict scrutiny continues to be the standard of review applicable here. Harper, Kramer, and Dunn are still good law.
But even if the Fourteenth Amendment of the federal constitution did not require it, the Michigan Constitution demands that 2005 PA 71 pass the strict scrutiny test in order to be pronounced constitutional. Detroit Common Council, Wilkins, Michigan State UAW, and Socialist Workers Party all speak to that fact.
The right to vote is fundamental, and the strict scrutiny test must be applied to any statute that infringes on it. It is beyond question that the requirements of 2005 PA 71 infringe on the right to vote by adding conditions to a voter’s access to the polling place. These conditions fail the strict scrutiny test because no compelling state interest in them has been demonstrated. Significant in-person voter fraud has not been shown to exist in Michigan. But, even if it had, less burdensome methods exist to combat whatever voter fraud may threaten to erupt. 2005 PA 71 should be held unconstitutional.
Those most severely prejudiced by today’s decision are the impoverished and the disadvantaged. Yet, Michigan has always enjoyed a strong reputation for the protection of our civil rights. This tragic decision has *111 the potential to wipe out many of this state’s achievements in this area. I believe that history will judge us harshly for joining those states that have limited the precious constitutional right to vote. Accordingly, I dissent.

 504 US 428; 112 S Ct 2059; 119 L Ed 2d 245 (1992).

 MCL 168.1 et seq.

 Burdick was not the first case to articulate the standard that emerges from blending United States Supreme Court decisions in the area of voting rights. The balancing test set forth in Burdick seems to have originated in Storer v Brown, 415 US 724; 94 S Ct 1274; 39 L Ed 2d (1974), and American Party of Texas v White, 415 US 767; 94 S Ct 1296; 39 L Ed 2d 744 (1974). In these two cases, the Court applied a type of intermediate scrutiny to the regulations under consideration. Zywicki, Federal judicial review of state ballot access regulations: Escape from the political thicket, 20 T Marshall L R 87,113-114 (1994). It appears that it is this intermediate level of scrutiny that led to the balancing test that the United States Supreme Court first clearly expressed in Anderson, 460 US at 789, and the majority attributes to Burdick. See Zywicki, supra, pp 114-116. See also Note: Better late than never: The John Anderson cases and the constitutionality of filing deadlines, 11 Hofstra L R 691, 703-704 (1983).

 In Jenness, in a perfunctory fashion that is inconsistent with strict scrutiny review, the Court upheld a petition nominating requirement because it was not unduly burdensome. Id. at 440-442.

 In Storer, the Court stated that “the rule fashioned by the Court to *86 pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a ‘matter of degree ....’” 415 US at 730.

 In Anderson, the Court set forth the test that the majority attributes to Burdick.
Constitutional challenges to specific provisions of a State’s election laws therefore cannot be resolved by any “litmuspaper test” that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff’s rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. [460 US at 789 (citation omitted).]

 A closer look at the Burdick opinion reveals the error of the majority’s analysis. The right at issue in the instant case is the right to cast a ballot. It is a fundamental right. Dunn, 405 US at 336. Burdick did not involve an individual’s right to cast a ballot. It involved a candidate’s right to appear on the ballot. The right of candidacy has never been recognized as a fundamental right. Clements v Fashing, 457 US 957, 963; 102 S Ct 2836; 73 L Ed 2d 508 (1982). Thus, Burdick is virtually of no assistance in determining whether the requirements at issue work a severe burden on the fundamental right to vote.

 383 US 663; 86 S Ct 1079; 16 L Ed 2d 169 (1966).

 Yet, the members of the majority find that Burdick repudiated an erroneous construction of the Equal Protection Clause. I am baffled by how they arrive at this conclusion. It seems to me highly unlikely that our most revered legal institution would announce a dramatic shift in the law without at least suggesting it and limiting existing precedent.

 531 US 98; 121 S Ct 525; 148 L Ed 2d 388 (2000).

 Bush does not even mention Burdick. The fact that Bush does not discuss Burdick is further substantiation that Burdick is not the landmark decision that the majority would have us believe.

 In Bush, the Supreme Court never explicitly stated what level of scrutiny it used in reviewing the constitutionality of the recount. However, the fact that the Court found the recount unconstitutional after summarily dismissing the interests prompting the recount indicates that the Court was utilizing strict scrutiny review. See Stewart v Blackwell, 444 F3d 843, 862 (CA 6, 2006); Hasen, Symposium: The law of presidential elections: Issues in the wake of Florida, 2000: Bush v Gore and the future of equal protection law in elections, 29 Fla St U L R 377, 395-396 (2001).

 For additional post-Burdick federal decisions finding that strict scrutiny applies to regulations that directly burden the right to cast a ballot, see, e.g., Greidinger v Davis, 988 F2d 1344, 1354 (CA 4, 1993) (finding that strict scrutiny applies to a voter registration scheme that conditions a voter’s right to vote on the public disclosure of the voter’s social security number); Republican Party of Arkansas v Faulkner Co, 49 *90 F3d 1289, 1298-1299 (CA 8, 1995) (Finding that the requirement that political parties conduct and pay for primary elections was subject to strict scrutiny. This is because it had the effect of forcing many voters, who wished to vote in the Republican primary, to vote either in the Democratic primary or not at all.).

 D. Bell, Court Jumps Into Dispute Over Voter ID Checks, Detroit Free Press (April 27, 2006) (quoting Secretary of State spokeswoman Kelly Chesney).

 E.g., Kusper v Pontikes, 414 US 51; 94 S Ct 303; 38 L Ed 2d 260 (1973) (Striking down a party affiliation statute that impaired the right to vote by preventing individuals who had voted in a primary from voting in another party’s primary for nearly two years. Less drastic alternatives existed that satisfied the state’s interest involved.); Hill v Stone, 421 US 289, 298; 95 S Ct 1637; 44 L Ed 2d 172 (1975) (Striking down a “dual box” voting technique because “in an election of general interest, restrictions on the franchise of any character must meet a stringent test of justification.”).

 None of the cases cited by the majority for the proposition that a lower standard of review applies concerned the regulation of an individual’s right to cast a ballot. The United States Supreme Court decisions cited by the majority are (1) Burdick, 504 US 428, (2) Timmons v Twin Cities Area New Party, 520 US 351; 117 S Ct 1364; 137 L Ed 2d 589 (1997), and (3) Storer, 415 US 724. Each of these cases dealt with a candidate’s right to get on the ballot, not an individual’s right to cast a ballot. The right of candidacy has never been recognized as a fundamental right. Clements, 457 US at 963. But, as the cases I cite demonstrate, when an individual’s right to cast a ballot is impaired, the United States Supreme Court has uniformly held that strict scrutiny applies.

 Bush, 531 US at 104.

 “[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must he closely scrutinized and carefully confined.”

 “Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.”

 “Because the right to vote is a fundamental right, any classification defining the ability to exercise the right must meet, under a strict scrutiny review, the dictates of the equal protection guarantee before the Court can sustain the measure as constitutional.”

 “Discriminate” is defined as “to make a distinction in favor of or against a person on the basis of the group or class to which the person belongs, rather than according to merit.” Random House Webster’s College Dictionary (2001).

 See Minnite & Callahan, Securing the Vote: An Analysis of Election Fraud (Demos, A Network for Ideas and Action, 2003), at: <http://www.demos.org/pubs/EDR_-_Securing_ the_Vote.pdf> (accessed July 11, 2007). After a review of news and legal databases and after interviews with state election officials, the authors found that, between 1992 and 2002, election fraud was “very rare” and a “minor problem” that “rarely affects election outcomes.” Id. at 4, 17.
See also E. Lipton & I. Urbina, In 5-Year Effort, Scant Evidence of Voter Fraud, NY Times (April 12, 2007) (accessed July 16, 2007). In the aftermath of the 2000 presidential election, the Department of Justice began an aggressive probe of voter fraud. That investigation revealed “virtually no evidence of any organized effort to skew federal elections.” Some have argued that the accusations of voter fraud have been advanced to mask efforts to suppress the rights of some to vote. There is evidence that supports this argument. See G. Gordon, 2006 Missouri Election was Ground Zero for GOP, McClatchy Newspapers (May 2, 2007) <http://www.realcities.com/mld/krwashington/news/nation/17168096.htm> (accessed July 11,2007). And, it has been advanced by the opponents of2005 PA 71. In his dissent, Justice Cavanagh makes a persuasive argument regarding the requirements’ potential negative effects on certain groups of voters.

 And it is not a lack of diligence that has prevented the production of such evidence. Rather, it is because there has not been a single documented instance of in-person voter fraud in the state of Michigan. In fact, it appears that only one allegation of in-person fraud has ever been made to the Secretary of State, and that allegation was never substantiated.

 The majority claims that signature matching is not a less restrictive option because it would still require a signature. What the majority-overlooks is that signature matching would require a signature from everyone, not just those who lack photo identification. It is this difference that makes signature matching a less restrictive, less discriminatory alternative.

 Study by National Conference of State Legislatures, available at <http://www.ncsl.org/programs/legismgt/elect/taskfc/voteridreq.htm> (accessed July 11, 2007).

 Brennan, State constitutions and the protection of individual rights, 90 Harv L R 489, 491 (1977).

 Note: Neither Icarus nor ostrich: State constitutions as an independent source of individual rights, 79 NYU L R 1833, 1835 (2004).

 Id. at 1842.

 Similarly, Justice Brandéis recognized the benefits of our federal system when he stated in New State Ice Co v Liebmann, 285 US 262, 311; 52 S Ct 371; 76 L Ed 747 (1932) (Brandéis, J., dissenting), “It is one of the happy incidents of the federal system that a single courageous State may, *97 if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.”

 443 Mich 744; 506 NW2d 209 (1993).

 Linde, E pluribus — Constitutional theory and state courts, 18 Ga L R 165, 179 (1984).

 The Twenty-sixth Amendment of the United States Constitution has lowered the voting age to 18. And, as the majority points out, other constitutional provisions may specifically take away an otherwise qualified individual’s right to vote. See, for example, Const 1963, art 2, § 2, which permits the exclusion of citizens from voting because of mental incompetence or commitment to a jail or penal institution. However, unless another constitutional provision specifically provides otherwise, anyone who meets the requirements of art 2, § 1 is qualified to vote. The majority claims that the Purity of Elections Clause is one of the constitutional provisions that provides otherwise. So, the majority asserts, the framers of our constitution thought it important enough to set forth -the qualifications to vote but then added the Purity of Elections Clause. The majority believes that the framers inserted that clause so that the Legislature could later add any other qualification it felt like adding. This argument cannot withstand scrutiny. To read the Purity of Elections Clause as broadly as the majority wishes would essentially render art 2, § 1 meaningless. I cannot accept that our framers would adopt a meaningless constitutional provision.

 Article 2, § 1 is not the only constitutional provision that gives rise to the requirement that strict scrutiny apply to regulations that impair the right to vote. The Michigan Constitution begins with the declaration that “[a]ll political power is inherent in the people. Government is instituted for their equal benefit, security and protection.” Const 1963, art 1, § 1. Additionally, the Michigan Equal Protection Clause prohibits any person from being denied the enjoyment of his or her “political rights.” Const 1963, art 1, § 2. These constitutional provisions indicate that the people of Michigan attach the utmost importance to the fundamental right to vote.

 385 Mich 670; 189 NW2d 423 (1971).

 The Equal Protection Clause is at art 1, § 2 of the Michigan Constitution.

 Id. at 684.

 The majority disregards Wilkins because Wilkins relied on federal law. But Wilkins’s reliance on federal law is irrelevant. Sitz, 443 Mich at *101 762 n 12 (“ ‘state courts are not required to incorporate federally-created principles into their state constitutional analysis’ ”) (citation omitted). The Wilkins Court held that any infringement on the right to vote triggers strict scrutiny review under the Michigan Equal Protection Clause. That the United States Supreme Court may have altered its interpretation of the federal constitution is not adequate reason to abandon a prior decision of this Court interpreting the Michigan Constitution. This Court should “not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection.” Id. at 759.
The majority also claims that Wilkins did not consider art 2, § 4 of the Michigan Constitution. The majority’s reading of Wilkins is incorrect. In Wilkins, the Court noted that the Court of Appeals had upheld the statute because it was a valid exercise of legislative authority under art 2, § 4. Wilkins, 385 Mich at 685. See also Wilkins v Ann Arbor City Clerk, 24 Mich App 422, 427; 180 NW2d 395 (1970). The Court rejected this argument because regulations enacted under this constitutional provision still must be supported by a compelling state interest. Wilkins, 385 Mich at 685-687.

 387 Mich 506; 198 NW2d 385 (1972).

 The majority claims that, when properly read, Michigan State UAW does not stand for the proposition that the Michigan Constitution requires the application of strict scrutiny to all voters-rights cases. I am baffled by this statement. In Michigan State UAW, the Court was very explicit in stating that it was considering only whether the statute at issue violated the Michigan Constitution, specifically art 2, § 1. The Court held that “[a]ny burden [on the right to vote], however small, will not be *102 permitted unless there is demonstrated a compelling state interest.” Michigan State UAW, 387 Mich at 516. The only possible way this decision can be read is that art 2, § 1 of the Michigan Constitution requires the application of strict scrutiny to regulations that burden the right to vote.

 The majority also claims that Michigan State UAW failed to consider the effect of art 2, § 4 of the Michigan Constitution. The majority’s reading of this opinion is incorrect. In Michigan State UAW, 387 Mich at 516, this Court explicitly recognized that the government had argued that the statute was authorized by this constitutional provision. This Court rejected the argument, determining that “the state still must demonstrate a compelling state interest to justify a law passed pursuant to [art 2, § 4].”

 412 Mich 571; 317 NW2d 1 (1982).

 The majority finds that Socialist Workers Party can be discarded because it relied on federal precedent in interpreting the Michigan Constitution. In Socialist Workers Party, this Court found that strict scrutiny applied under the Michigan Constitution. It relied on the federal constitution in making that decision. Regardless, the case is relevant to show that, under the state constitution, strict scrutiny applies to the requirements at issue. As I stated earlier, this Court should “not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection.” Sitz, 443 Mich at 759.

 The majority claims that these decisions can be ignored because they were decided at a time when all voting regulations were subject to strict scrutiny. This simply is not true. At the same time this Court decided Michigan State UAW and Wilkins, and over 10 years before this Court decided Socialist Workers Party, the United States Supreme Court explicitly maintained that “not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review.” Bullock, 405 US at 143. Accordingly, to claim that this Court decided these cases assuming that strict scrutiny applies to all voting regulations assumes that past members of the Court misunderstood the decisions of the United States Supreme Court. This is an insulting assumption. Out of deference to and respect for my predecessors, I assume that they were well aware that the federal constitution did not require application of strict scrutiny in all instances. Rather, they made a conscious decision that the Michigan Constitution, unlike the federal constitution, requires any infringement on the right to vote to withstand strict scrutiny review.

 Numerous state courts have found that their state constitution affords greater protection against infringements on the right to vote than the federal constitution. E.g., Weinschenk v State, 203 SW3d 201, 212 (Mo, 2006); Maryland Green Party v Maryland Bd of Elections, 377 Md 127, 150; 832 A2d 214 (2003).

 The Fifteenth Amendment provides:
The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.
The Nineteenth Amendment provides:
*106 The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.
Congress shall have power to enforce this article by appropriate legislation.
The Twenty-sixth Amendment provides:
The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.
Congress shall have power to enforce this article by appropriate legislation.

 Const 1963, art 1, § 2. This provision provides:
No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

 US Const, Am Xiy § 1. This provision provides:
All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

 All of art II is dedicated to elections.

 2005 PA 71 cannot withstand strict scrutiny review because (1) there is no evidence that in-person voter fraud is a significant problem in Michigan, and (2) even if it were, there are other methods to combat fraud that are less burdensome than the requirements at issue.